**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

VIRGINIA SCHMITTOU,

Plaintiff,

v.

WAL-MART STORES, INC.,

Defendant.

Civil No. 01-1763 (JRT/RLE)

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Lisa D. Wilson, AGNEW DRYER STORAASLI KNUTSON & POMMERVILLE, 200 Sellwood Building, 202 West Superior Street, Duluth, MN 55802, for plaintiff.

Jason M. Hedican, BRIGGS & MORGAN, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for defendant.

Plaintiff Virginia Schmittou ("Schmittou") has sued her former employer, Wal-Mart Stores, Inc. ("Wal-Mart"), for employment discrimination after being terminated for excessive absenteeism. Plaintiff's complaint was removed from St. Louis County District Court, and alleges five causes of action: (1) breach of contract; (2) violation of the Minnesota Parenting Leave Act, Minn. Stat. §§ 181.940 *et seq.*; (3) discrimination and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; (4) gender discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363.01 *et seq.*; and (5) "familial discrimination" under the

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

MHRA. Wal-Mart has moved for summary judgment on all five counts. For the reasons discussed below, the Court grants Wal-Mart's motion.

## BACKGROUND

Schmittou was hired at the Wal-Mart store in Hermantown, Minnesota as an at-will employee on December 4, 1991. Her performance reviews were never worse than satisfactory, and she received regular pay raises. From time to time, Schmittou received a copy of Wal-Mart's Associate Handbook, which contained the company's employment policies. Among the Wal-Mart policies relevant to this case are the FMLA policy, the company discipline policy known as "Coaching for Improvement," the attendance/punctuality policy ("attendance policy"), and the "Illness Protection Plan." Upon receiving handbooks in 1994 and 1998, Schmittou signed statements agreeing that the handbooks did not "constitute terms or conditions of employment" or a contract. (Hedican Aff. Ex. 12, 13.)

Wal-Mart's "Coaching for Improvement" policy employs four levels of progressive discipline: Verbal Coaching, Written Coaching, granting the employee a "decision-making day," and finally, termination. Wal-Mart's attendance policy incorporate this progressive discipline, providing that four unapproved absences within any six-month rolling period calls for written coaching, five absences for a "decision-making day," and six absences for termination. The attendance policy defines an "absence" as any time an employee misses a scheduled work shift without scheduling

that absence in advance. Under the policy, a limited class of absences are "approved,"[1] while all other absences are deemed "unapproved." This policy also applies to tardiness, with three unapproved "tardies" equaling one unapproved absence. Under the policy, any absences or tardies that relate to illness are unapproved unless they are covered by a leave of absence, the FMLA, or the Americans with Disabilities Act. Wal-Mart's Illness Protection Plan provides employees with paid sick days. Wal-Mart notes that while the plan is an "income replacement plan," it does not excuse absences for illness that are otherwise unapproved.

Schmittou was granted a four-month leave of absence to care for her newborn daughter following the baby's birth in September 1999. The relevant issues in this case all arose after Schmittou returned from that maternity leave in January 2000. Upon Schmittou's return, Wal-Mart assistant manager Rochelle Kahl ("Kahl") was responsible for tracking Schmittou's attendance. Upon noticing a pattern of attendance violations, Kahl verbally counseled Schmittou once or twice before October 3, 2000. On that date, Schmittou had another unapproved absence. On October 4, Kahl delivered a "written coaching" to Schmittou. The coaching form noted that Schmittou's "attendance does not meet company standards and is a violation of company policy." (Hedican Aff. Ex. 21.) Kahl also noted that as of October 4, 2000 Schmittou had 33 unapproved absences, and that this was "unacceptable." *Id.*

---

[1] "Approved" absences are defined as: (1) bereavement leave and emergency volunteer time; (2) emergency situations (i.e. weather, medical emergencies); (3) requested schedule changes that are approved by management one day prior to the change, including leave of absence. (Hedican Aff. Ex. 16.)

In response to the written coaching, Schmittou noted that other employees were not being disciplined for similar attendance problems, stating that "[m]any associates don't work scheduled hours they all come and go as they want." (*Id.*) Dave Keller ("Keller"), the Hermantown store manager, testified that Schmittou came to him on one occasion to say that another employee, Eric Omundson ("Omundson"), was also missing many shifts. Keller assured her that something was being done about it, and instructed his assistant manager to begin coaching Omundson.

On November 4, 2000, Kahl conducted Schmittou's annual review. The review noted that Schmittou met or exceeded company expectations in every category except attendance, in which Schmittou was below company expectations. The review addressed Schmittou's attendance by referring to the October 4 written coaching.

Following her written coaching, Schmittou had four more unapproved absences. Two of these took place before her November 4 review, and two of them took place afterward.[2] This led Kahl on November 13, 2000 to give Schmittou a decision-making day, the next-to-last step of Wal-Mart's progressive discipline policy. As part of the decision-making day, Schmittou prepared a written statement in which she said that she would try to "not miss so much work time due to sickness and or family occurrence." (Hedican Aff. Ex. 25.)

[2] The absences consisted of one missed day, two unapproved absences, one unapproved "left early," and two unapproved tardies. (Hedican Aff. Ex. 25.) These occurred on October 12, 2000, November 2, 2000, November 9, 2000, and November 13, 2000. (Def. Mem. at 5 n. 4.)

On December 20, 2000, Schmittou submitted a change of availability form, changing her start time from 7:30 a.m. to 8:00 a.m. Wal-Mart states that such schedule changes do not take effect for three weeks, so until three weeks after submission of the form, Schmittou's start time remained 7:30 a.m. The parties dispute when this schedule change became effective, but it is undisputed that any schedule change in December 2000 does not affect the tardies that led to Schmittou's decision-making day, in October and early November 2000.

Following the November 13, 2000 decision-making day, Schmittou had five more unapproved absences.[3] Two of the unapproved absences, March 12 and March 21, 2001, relate to the health of Schmittou's daughter, Stephanie. Stephanie apparently became ill with gastroenteritis around March 10, 2001. Schmittou gave her daughter Tylenol, but did not take her to the doctor. Schmittou missed work on March 12 to care for Stephanie, and was allowed to leave early to care for her the next three days. On March 15, Schmittou called the doctor, who advised her to continue administering Tylenol and to give Stephanie a particular diet.[4] The record suggests that Stephanie had recovered by March 18. On March 21, 2001, Schmittou missed work to take Stephanie to the doctor for her 18-month check-up.

[3] According to Wal-Mart, these were on December 21, 2000, January 2, 2000, March 12, 2001, March 20, 2001, and March 21, 2000. (Def. Mem. at 7-8.)

[4] This was the "BRAT" diet, which consists of bread, rice, applesauce, and toast.

As a result of the five unapproved absences since her decision-making day, and her attendance problems in general, on March 23, 2001 Wal-Mart terminated Schmittou for violating its attendance policy.

Although Schmittou had been fired, on May 15, 2001, Wal-Mart certified her as eligible for re-hire at the Hermantown store. In her application, Schmittou indicated that she was only available to work weekdays from 7 a.m. to 5 p.m., and that she expected wages of $11.47 per hour, the same hours and wages as her previous position.[5] Wal-Mart states that Schmittou was not interviewed or hired for the open position because the job required work on nights and weekends, and the pay was only $7.00 to $8.00 per hour. Schmittou's job application expired on July 15, 2001, and she has not applied again.

## ANALYSIS

### I. Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude

[5] Schmittou failed to complete the application, which Wal-Mart states was reason enough not to interview her. The application states that it "will not be considered unless fully completed." (Hedican Aff. Ex. 30.) The only portions that Schmittou left blank were sections asking why she left her previous employment.

the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

## II. Gender Discrimination

Schmittou alleges disparate treatment based on her gender, contending that she was fired for attendance problems while similarly situated men at the Hermantown store were not. Schmittou's claim under the MHRA is analyzed under the familiar burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Sigurdson v. Carl Bolander & Sons, Co.*, 532 N.W.2d 225, 228 (Minn. 1995). Under this framework, Schmittou must first establish a prima facie case of

discrimination. If she can do so, the burden then shifts to Wal-Mart to articulate a legitimate, non-discriminatory reason for terminating her. The burden then shifts back to Schmittou, who must demonstrate that Wal-Mart's reason is pretext. To demonstrate a prima facie case of gender discrimination, Schmittou must demonstrate that: (1) she is a member of a protected class; (2) she met applicable job qualifications; (3) Wal-Mart took adverse employment action against her; and (4) similarly situated employees who were not members of the protected class were treated differently. *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir. 1999).

It is undisputed that Schmittou belongs to a protected class and that in firing her, Wal-Mart took an adverse employment action against her. Wal-Mart argues, however, that Schmittou cannot demonstrate a prima facie case because she was not qualified for the job and because she cannot demonstrate that similarly situated male employees were treated differently.

First, Wal-Mart argues that Schmittou was not qualified because her attendance problems show that she was not meeting the company's legitimate work expectations. This is an improper standard. The Eighth Circuit has held that for the purpose of establishing a prima facie case of discrimination, a plaintiff need only show her "objective qualifications for the job." *Kobrin v. University of Minnesota*, 34 F.3d 698, 702 (8th Cir. 1994); *Legrand v. Trustees of University of Arkansas at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987). Requiring Schmittou to demonstrate at this stage of the inquiry that she was not genuinely fired because of her attendance problems improperly conflates

the three *McDonnell-Douglas* steps. *Kobrin*, 34 F.3d at 702. This defeats the point of the burden-shifting analysis, and is inappropriate when analyzing the prima facie case. In this case, Keller, the store manager, testified that Schmittou was qualified to perform her job. (*See* Keller Dep. at 147.) Therefore, the Court finds that Schmittou has shown that she possessed the objective qualifications for her job.

Second, Wal-Mart argues that Schmittou cannot show that similarly situated male employees were treated better than she. Schmittou contends that two men in particular – Erick Omundson and Scott Johnson – were similarly situated because they had attendance problems, but they were treated better and were not terminated. Wal-Mart argues that Johnson is not similarly situated because he was disciplined for his absences, though he was not dismissed because his violations were not as severe. The record suggests, however, that Omundson's attendance problems were at least as severe as those of Schmittou. Wal-Mart argues that Omundson is not similarly situated because he was not supervised by Kahl for the same length of time as Schmittou. The Court finds this argument unpersuasive. It is true that individuals used for comparison in discrimination cases "must have dealt with the same supervisor." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). In this case, Omundson and Schmittou did deal with the same supervisor. Wal-Mart has not shown how the difference in time that Kahl supervised Omundson and Schmittou explains the apparent difference in their treatment. Therefore, the Court finds that Schmittou has shown that similarly situated male employees were treated better, and that she has thus demonstrated a prima facie case of discrimination.

The burden now shifts to Wal-Mart to articulate a legitimate, non-discriminatory reason for terminating Schmittou. The parties do not dispute that Wall-Mart has articulated such a reason; Wal-Mart claims that it fired Schmittou because she violated the company's attendance policy. Schmittou argues that this reason is pretext because some of the absences and tardies that led to her termination were misclassified as unapproved when they should have been approved. Specifically, Schmittou argues that the times she was absent while caring for her sick daughter should have been approved. As will be discussed in Parts III and IV of this memo, however, this claim is based on Schmittou's erroneous interpretation of the Illness Protection Plan, the FMLA, and Minnesota law. Wal-Mart's company policy clearly states that non-FMLA leaves are not necessarily "approved" absences. As discussed below, because Schmittou is not eligible for leave under the FMLA, she cannot now claim that these absences and tardies were improperly classified as unapproved. Schmittou also disputes other unapproved tardies, claiming that these should have been approved because she submitted a change of availability form, moving her start time from 7:30 a.m. to 8:00 a.m. Wal-Mart contends that such changes do not take effect until three weeks after submission. Schmittou has not rebutted this contention.

Schmittou's evidence of pretext is extremely thin. Her argument is further undermined by evidence showing that several male Wal-Mart employees were terminated for excessive absenteeism. (*See* Hedican Aff. Ex. 43-45.) There is also evidence of female employees who violated the attendance policy, but who were not terminated. (*See*

Hedican Aff. Ex. 38-42.)[6] Schmittou even testified that her replacement, a woman, was treated better in terms of attendance. (*See* Schmittou Dep. at 152.) These facts refute Schmittou's argument that she was terminated because of her gender. In sum, the Court finds that although Schmittou may note some anomalies in Wal-Mart's attendance policy, she has not demonstrated that a genuine issue of material fact exists as to whether Wal-Mart's reason for firing her was pretext. For this reason, Wal-Mart is entitled to summary judgment.

## III. Family and Medical Leave Act Claims

Schmittou's FMLA claims revolve around her daughter's March 2001 illness. Schmittou first claims that Wal-Mart classified absences related to the illness as "unapproved," when the company should have granted her leave under the FMLA. Second, Schmittou contends that Wal-Mart fired her, and then refused to re-hire her in retaliation for her exercising rights under the statute.

The FMLA entitles employees to leave from work due to "serious health conditions" that afflict their immediate family members. 29 U.S.C. § 2612(a)(1)(C); *Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 673-74 (8th Cir. 2000); *McGraw v.*

---

[6] Each of these female employees received more than six unapproved absences in a six month rolling period, which under company policy is grounds for termination. For example, Kristy Usack had 14 and 15 unapproved absences in consecutive six month periods, (Hedican Aff. Ex. 38); Cari Benham had 8, 15, and 14 unapproved absences in three different six month periods, (Hedican Aff. Ex. 39); Hope Kovacevich had 7 unapproved absences in one six month period, (Hedican Aff. Ex. 40); Sarah Sickler had 9, 9, and 6 unapproved absences in three consecutive six month periods, (Hedican Aff. Ex. 41); and Mellissa Peterson had 10 and 7 unapproved absences in consecutive six month periods, (Hedican Aff. Ex. 42).

*Sears, Roebuck & Co.*, 21 F. Supp. 2d 1017, 1022 (D. Minn. 1998). An employee has a duty, however, to provided the employer with adequate notice of the need for FMLA leave. *McGraw*, 21 F. Supp. 2d at 1022. *See* 29 C.F.R. §§ 825.302-.303.

**A. Eligibility**

Wal-Mart argues that Schmittou was never eligible for leave under the FMLA because: (1) she did not give proper notice of her need for leave under the statute; and (2) her daughter did not suffer from a "serious health condition," as is required by the statute.

**1. Notice**

Schmittou argues that Wal-Mart was put on notice that she may need FMLA leave because she missed work due to Stephanie's illness, and because Wal-Mart knew Stephanie was ill. Stephanie's illness caused Schmittou to receive one unapproved absence, on March 12, 2001. On March 13-15, Schmittou asked for and received permission to leave early to care for Stephanie. Although an employee "need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work," *Thorson v. Gemini, Inc.*, 205 F.3d 370, 382 (8th Cir. 2000), a "mere declaration . . . that a family member is ill, is insufficient to comply with the FMLA's notice requirement." *McGraw v. Sears, Roebuck & Co.*, 21 F. Supp. 2d 1017, 1022 (D. Minn. 1998). Wal-Mart's duties under the FMLA would therefore be triggered only if Schmittou provided "enough information to put [Wal-Mart]

on notice that [she] may be in need of FMLA leave." *Thorson*, 205 F.3d 381. *See Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) (recognizing that plaintiff's calling in "sick" is insufficient notice under FMLA, and that plaintiff must provide notice of a serious health condition).

In this case, Schmittou did not provide notice sufficient to trigger Wal-Mart's duties under the FMLA. The record shows only that Wal-Mart knew Schmittou was taking time off to care for her daughter. There is no evidence in the record that Wal-Mart knew or should have known that Stephanie had a serious medical condition, but only that she was sick. As discussed above, this is insufficient under the statute.

**2. Serious Health Condition**

Even if Schmittou did provide sufficient notice of her intent to take FMLA leave, she is still not entitled to relief because she was not eligible under the statute. As noted above, Schmittou is eligible under the FMLA only if Stephanie was suffering from a "serious health condition." The parties agree that Stephanie had such a condition if she received "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). There are two ways to satisfy this requirement: (1) to receive treatment two or more times by a health care provider; or (2) to receive treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the provider's supervision. 29 C.F.R. § 825.114(b)(1); 29 C.F.R. § 825.800.

Schmittou argues that Stephanie received treatment twice: once during the phone call with her doctor on March 15, 2001, and once during the March 21 doctor's

appointment. The Court finds that neither of these occasions constitute treatment, and that under either regulatory definition, Stephanie never received "continuing treatment by a health care provider."

First, The Court finds that the March 15 phone call with the doctor does not constitute treatment. During this phone call, the doctor merely advised Schmittou to continue administering Tylenol and the BRAT diet. FMLA regulations clearly state, however, that a regimen "that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and **other similar activities that can be initiated without a visit to a health care provider**, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave." 29 C.F.R. § 825.114(b) (emphasis added). At oral argument, Schmittou's counsel conceded that this regulation, on its face, likely excludes Stephanie's brief illness. Schmittou argues, however, that the regulation was intended to refer to adults, and that this Court should read the regulation more broadly for children's illnesses. Schmittou has provided no authority to support this policy-based argument. Even if this Court were free to adopt her interpretation, it would decline to do so in light of the regulations' clear language and applicability to this case, as well as persuasive authority weighing against Schmittou's argument. *See Brannon v. Oshkosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1035-36 (M.D. Tenn. 1995) (finding that gastroenteritis is akin to a minor illness that Congress sought to exclude from FMLA coverage). Therefore, the Court finds that the March 15 phone call did not constitute treatment under the FMLA.

Schmittou also provides no evidence that the March 21 appointment was related to Stephanie's illness. Therefore, it cannot be considered treatment under the statute. The medical records of the March 21 visit indicate that it was a regularly-scheduled check-up. (*See* Hedican Aff. Ex. 28.) Moreover, the doctor's notes of the visit refute Schmittou's allegation that Stephanie was still sick on March 21. (*Id.* (stating that Stephanie was a "well-child with resolved gastroenteritis").) Therefore, the record demonstrates that any treatment that Stephanie received on March 21 was unrelated to her previous illness, and cannot make Schmittou eligible under the FMLA.

It is clear that neither the March 15 phone call nor the March 21 doctor visit constituted "continuing treatment by a health care provider." Schmittou therefore did not take leave to care for the serious health condition of a family member, and is ineligible under the FMLA. Accordingly, the Court rejects Schmittou's claim that Wal-Mart violated the Act by denying her covered leave.

**B. Discrimination / Retaliation**

Schmittou also argues that Wal-Mart terminated her and also refused to re-hire her in retaliation for her exercising rights under the FMLA. This claim must fail because Schmittou was never eligible under the statute. In order to demonstrate a prima facie case of retaliation under the FMLA, Schmittou must show that she engaged in "protected activity" under the Act. *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). *See Hatchett v. Philander Smith College*, 251 F.3d 670, 677 (8th Cir. 2001) ("In order to establish the prima facie case for FMLA retaliation, the employee must demonstrate that FMLA leave

was the determinative factor in the employment decision at issue.") As discussed above, Schmittou was not eligible for leave under the FMLA, so it was impossible for her to engage in any activity protected by the statute. For this reason, Schmittou's claims of retaliation under the FMLA fail.

## IV. Minnesota Parenting Leave Act

Schmittou contends that in firing her, Wal-Mart violated Minnesota's parenting leave law. This statute provides in relevant part:

> An employee may use personal sick leave benefits provided by the employer for absences due to an illness or for injury to the employee's child for such reasonable periods as the employee's attendance with the child may be necessary, **on the same terms as the employee is able to use sick leave benefits for the employee's own illness or injury.**

Minn. Stat. § 181.9413(a) (emphasis added). Schmittou argues that Wal-Mart violated this statute by providing her with paid sick leave through the Illness Protection Plan, but still counting certain sick days as unapproved absences for purposes of the attendance policy. She claims that this violates the "spirit and intent" of the Minnesota Parenting Leave Law. (Pl. Mem. at 32.)

Schmittou's argument is without merit because she misapplies the Minnesota statute. The statute does nothing more than permit employees to use their employer-provided sick benefits to care for a sick child. Nothing in the record suggests that Wal-Mart prevented Schmittou from doing this. The record is clear that Schmittou took sick time to care for Stephanie. Schmittou does not allege that Wal-Mart prevented her from taking time to do this, or even that it refused to compensate for her sick time. As

discussed above, Wal-Mart's Illness Protection Plan compensates employees for days missed due to illness, but it does not excuse absences (for attendance purposes) that are otherwise unapproved. However, Schmittou asks that Wal-Mart be required to count non-FMLA sick days as approved absences. Nothing in the Minnesota law requires Wal-Mart to do so. Schmittou's claim under the Minnesota Parenting Leave Act therefore fails.

## V. Breach of Contract

Schmittou alleges that Wal-Mart breached its contract with her by violating its progressive discipline policies contained within the employee handbook, and by violating its Illness Protection Plan by not approving the sick leave that led to her termination. This claim fails because Schmittou was an at-will employee who never had a contract with Wal-Mart. The Wal-Mart employee handbook contains explicit disclaimers, which provide that the policies it describes do not constitute terms or conditions of employment or a contract. Each time Schmittou received a handbook, she signed a form acknowledging these disclaimers. (*See* Hedican Aff. Ex. 12, 13.) Employee handbooks can constitute offers for employment. *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626-27 (Minn. 1983); *Feges v. Perkins Restaurants, Inc.*, 483 N.W.2d 701, 707 (Minn. 1992). However, a disclaimer precludes employees from claiming contract rights under the handbook. *Feges*, 483 N.W.2d at 708. *See Ewald v. Wal-Mart Stores, Inc.*, 139 F.3d 619, 622 (8th Cir. 1998) (finding that neither Wal-Mart's associate handbook nor its "Coaching for Improvement" policy created a contract).

Schmittou relies upon one case to support her breach of contract claim. *See Brown v. Tonka Corp.*, 519 N.W.2d 474 (Minn. Ct. App. 1994.) That case is inapposite, however, because it deals with terminated employees seeking compensation for accrued vacation time. *See id.* at 475-76. The *Brown* court did not address the question of contract formation. Even if it did, in *Brown* there was no disclaimer, which in this case prevents the formation of any contract. The record clearly demonstrates that Schmittou was an at-will employee, and Schmittou cannot demonstrate any genuine issue of material fact on her breach of contract claim. Wal-Mart is therefore entitled to summary judgment.

## VI. Familial Discrimination

Schmittou also alleges a claim of "familial discrimination." The MHRA and Title VII do not expressly provide for such claims, but Schmittou contends that her claim is premised upon the "sex-plus" theory of discrimination, which Minnesota courts have recognized under the MHRA. *See Pullar v. Independent Sch. Dist. No. 701, Hibbing*, 582 N.W.2d 273, 276-277 (Minn. Ct. App. 1998). Under the "sex-plus" theory, a plaintiff "does not allege that the employer discriminated against a protected class as a whole, but rather that the employer disparately treated a sub-class within the protected class on the basis of an immutable characteristic such as familial status." *Id.* at 277.

To prevail under this theory, Schmittou must show that Wal-Mart discriminated against a sub-class of women with children, and that similarly situated men with children were treated better. *Coleman v. B-G Maintenance Mgmt. of Colorado, Inc.*, 108 F.3d

1199, 1203-04 (10th Cir. 1997). Schmittou cannot prevail, because she has provided no evidence that Wal-Mart discriminated against a sub-class of women with children. In fact, the woman who replaced Schmittou, Rose Hanson, has children. (*See* Schmittou Dep. at 139.) This undermines Schmittou's claims that she was treated worse because of the combination of her gender and familial status. Because she can do no more than allege that some men with children were treated better than she was as an individual, Schmittou's "sex-plus" discrimination claim fails.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 12] is **GRANTED**; and

2. Plaintiff's Complaint [Docket No. 1] is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: August 22, 2003
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge